**UNITED STATES of America, Plaintiff,**

**v.**

**Melvin A. SLAWIK, Defendant.**

**Crim. A. No. 75–110.**

United States District Court, D. Delaware.

Feb. 24, 1977.

---

Alan J. Hoffman, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Bruce M. Stargatt and Richard A. Zappa, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant.

## OPINION

STAPLETON, District Judge:

This case is currently before the Court on a motion of defendant Melvin Slawik for leave to withdraw a plea of guilty which he entered on June 15, 1976 to a charge of obstructing a criminal investigation in violation of 18 U.S.C. § 1510. An evidentiary hearing has been held in connection with this motion and the Court now makes the following findings of fact and conclusions of law based on the evidence there tendered and the record of prior proceedings in this case.

On August 1, 1975 Mr. Slawik, who was then serving as County Executive of New Castle County, was charged in a thirteen count indictment, six counts of which alleged violations of Title 18, United States Code, Sections 371, 1510, 1503 (Counts 1, 2 and 3), and Section 1623 (Counts 7, 8 and 9). The remaining seven counts of the indictment were dismissed by Order of the Court based upon motions filed by the defendant and the United States. A motion of the defense to sever the first three counts from the others for trial was granted and the government was required to elect which set of charges would be tried first.

On March 9, 1976, following a well publicized two week jury trial before Judge James L. Latchum, Mr. Slawik was convicted of three counts of perjury. As a result of these convictions, the Governor of Delaware removed Slawik from public office three days later. On April 21, 1976 Slawik received a sentence of four years incarceration to run concurrently on each of the three counts.

Trial on the obstruction of justice charges against the defendant and three others, Mario Capano, Bruce Uffelman and Daniel Rappa, was subsequently set for June 22, 1976. By agreement of all parties, a jury trial was waived and Judge Murray M. Schwartz was thereafter assigned to hear the case.

As the parties were preparing for trial, the government initiated plea bargaining negotiations on Friday, June 4, 1976. During the week that followed, the prosecution talked at length with Mr. Slawik's counsel and they, in turn, talked at length with him about the advantages and disadvantages of the various courses open to him. On Friday, June 11, 1976, Mr. Slawik executed a plea agreement under which the government, in exchange for Mr. Slawik's agreement to enter a guilty plea to one count, agreed to dismiss the remaining counts against him and to stipulate pursuant to Rule 11(e)(1)(C) that Mr. Slawik's maximum exposure with respect to incarceration would be a sentence of one year and a day. Any term of incarceration was to run concurrently with the previously imposed sentences and was not to commence until final disposition of the appeal from the prior convictions which was then pending in the Court of Appeals.

The plea agreement was presented to me on Friday, June 11th, along with a plea agreement which had been executed by defendant Capano. At the suggestion of counsel that they be afforded the opportunity to convince the Court that the agreement should be accepted by the Court, I met with them during the day to be informed of the considerations which had led each side to enter the plea agreement. During this conference, Mr. Slawik's attorneys represented to the Court that one of the primary benefits to the government from the agreement would be that Mr. Slawik was exposing himself to the possibility of a one year sentence which would have to be served even if the perjury convictions were reversed on appeal.

In view of my limited prior exposure to this case, it was agreed that I should be afforded the opportunity to review transcripts of the body tape recordings which had been introduced at the first trial and to hear from the government, ex parte, its evaluation of its case against each of the four defendants. During the government's presentation, the prosecution related its view that it had a strong case of obstruction of justice and conspiracy against Mr. Slawik based upon the tapes and the testimony he had given in open court at the first trial. The government further indicated that its cases against defendants Rappa and Uffelman were weaker and would not be pressed if the need for a trial were obviated by pleas from the other two defendants. The prosecutor announced the resolve to proceed against defendants Rappa and Uffelman, however, if the case went to trial.

At the close of the day the Court announced that it would not accept the Slawik plea agreement. It is fair to say that this was a disappointment to both sides. Mr. Slawik's attorneys requested that a record be made of the Court's rationale presumably so that the Court's discretion could ultimately be reviewed.

On Monday morning, June 14, 1976, the Court was presented with a new plea agreement containing an additional commitment of Mr. Slawik to cooperate in a continuing investigation of the U.S. Attorney's Office. The agreement was accompanied by a copy of the District of Columbia Circuit Court's decision in *United States v. Ammidown,* 162 U.S.App.D.C. 28, 497 F.2d 615 (1973), which set forth standards for the exercise of district court discretion in passing on plea agreements and which overturned a lower court decision declining to approve such an agreement. A hearing was promptly scheduled for that afternoon at which the parties placed their positions on the record in open court with all defendants present. After the government's presentation, which alluded, among other things, to the burden of the trial and possible appeal on the resources of the U.S. Attorney's Office, Mr. Slawik's counsel advised the Court as follows:

MR. STARGATT: Your Honor, I rise to outline to the Court those factors which were considered by Defendant Slawik in entering into the plea agreement.

\*   \*   \*   \*   \*   \*

In terms of background, the plea agreement came about as the result of discussions commenced and initiated by the United States Attorney's Office. There followed lengthy discussions between Mr. Zappa and me and Mr. Hoffman and, to a lesser extent, Mr. Stabler, after the most serious deliberation by Mr. Slawik. I wish to underscore that Mr. Slawik's point of view derives from his sincere belief that he is not guilty of any of the charges contained in the current indictment.

I also wish to emphasize the fact that Judge Schwartz on the trial of this case might well find Slawik not guilty of any of the charges. I believe in my own heart that that is a real possibility.

Mr. Slawik has consciously and deliberately decided to swap off the possibility of acquittal for the consideration outlined in the plea agreement because of the risks and problems which the upcoming trial entail. First, if convicted—and there is a serious possibility that he would be convicted—he might well draw a prison sentence of longer than a year. That could be material if the perjury conviction now on appeal were reversed, or if the perjury case were affirmed and the perjury sentence were reduced upon motion for reduction.

Second, if the perjury case were affirmed and the sentence were to stand, and if Mr. Slawik were convicted, in the present case, it would be legally permissible for the Court to impose a consecutive sentence in the second case. I would argue that such a sentence would be barbaric, that it would be vindictive and unwarranted, but it is legally possible, and the results of such a sentence from Slawik's point of view would be unthinkable.

Third, Mr. Slawik seeks to avoid another long trial. The first was traumatic in ways that we who represent litigants can imagine but not really feel. A second trial would be hurtful not only to himself but to his wife and to his children, and it would be hurtful to his economic interests because he now earns his living by working in a barroom that he partly is in the process of buying, a far cry from the responsible job he had before, but what he does to make a living.

The plea bargain avoids the risk and eliminates the trauma of trial. It has, from Slawik's point of view, advantageous features. It allows him to continue to protest his innocence because of the Alford feature, even while agreeing to the Court's adjudication of his guilt by his plea. This is most important to him because he steadfastly proclaimed his innocence and believes it.

It also affords the possibility, subject to the Court's discretion, of his serving less than the maximum sentence provided for under the agreement. Let me say on this point, in further response to Your Honor's question, that the sentencing alternatives were carefully thought out by the prosecution and by us in connection with putting before Your Honor an appropriate plea bargain. A year and a day could have been agreed to as a straight sentence. Obviously that would have been acceptable to the Government. From our side we wish the Court to have latitude in connection with the sentencing of this defendant, and if the plea agreement is acceptable and the plea is recorded, that discretion will be afforded to Your Honor; and it was simply in recognition of various of the alternatives that the provisions of the Parole Commission and Reorganization Act, effected just last month as amended, were outlined.

\*   \*   \*   \*   \*   \*

Finally, for myself, I do not want the Court to think that I personally view the plea agreement as a magnificent professional achievement for a client. I do not. Rather, I view it as representing a bal-

ance between the risks and problems inherent in the present prosecution and the certainties which the plea agreement will afford. The balance was struck by Mr. Slawik himself after full advice and counsel from me as to the alternatives, but with no recommendation from me whatsoever as to whether he should or should not strike the bargain. The bargain is his knowingly and intelligently made and entered into. The plea agreement having been made, I join the Government in urging that it be accepted by the Court pursuant to Rule 11(e)(3).

The Court reserved decision until the following morning at 9:15 A.M. At that time the Court indicated that it would approve the two tendered plea agreements if defendants Slawik and Capano still wished the Court to do so, and announced the considerations which had led to this decision. The Court then proceeded to examine each of these defendants, under oath, as contemplated by Rule 11. During the Rule 11 proceedings the government outlined the evidence it would introduce if Mr. Slawik did not plead guilty. This presentation included quotations from Slawik's prior trial testimony which tended to show, *inter alia,* that Mr. Slawik had threatened one Bayard Austin with the intention of getting him to plead the Fifth Amendment rather than give information to the FBI which it was then seeking in the course of an investigation. Following this presentation, the Court asked Mr. Slawik why he wished to plead guilty under *North Carolina v. Alford,* despite the fact that he denied his guilt. His answer and the follow-up questioning went as follows:

MR. SLAWIK: I don't feel that I am guilty of any Federal violations, but at the same time I've just gone through a long trial for perjury, and I wasn't guilty of that either, I really wasn't. But I got convicted anyway. My lawyer advises me that I have substantial risk of, you know, being convicted on this one. And facing, you know, another trial, the time and so on, the long investigation, frankly, I just surrender, Your Honor. You know, I just want to get it over with.

THE COURT: You were present, of course, in the courtroom yesterday when Mr. Stargatt outlined the reasons that your side of the case was willing to enter into this agreement?

MR. SLAWIK: Yes, I was.

THE COURT: And what he said was certainly consistent, and you've repeated a substantial portion of what he just said. But did you agree with the reasons Mr. Stargatt articulated yesterday?

MR. SLAWIK: Yes. This was on the basis of discussions that we had regarding the risk and so on. Again, I feel in my heart and my mind that I'm not guilty of these charges.

At the close of the Rule 11 proceeding the Court made the following findings:

THE COURT: I am satisfied that Mr. Slawik and Mr. Capano understand what their rights are, that they understand what they are charged with and what the maximum consequences of these pleas could be. I am convinced that they are acting voluntarily in tendering these pleas. I am satisfied that there is a basis in fact for the charges that are made in Count Two and that the defendants have made an informed choice with respect to these pleas, and, accordingly, I am going to accept them.

Immediately thereafter the Court granted the government's motion to dismiss the charges against defendants Rappa and Uffelman.

On August 9, 1976 the defendant was sentenced to one year's incarceration to run concurrently with the perjury sentences. Execution of the sentence was deferred until the appeal of the perjury convictions was completed.

On January 3, 1977, a panel of the Third Circuit Court of Appeals reversed Mr. Slawik's perjury convictions. The Court held that all three perjury counts of the indictment should have been dismissed. Two were found to be based on grand jury questioning which the Court found to be vague and ambiguous. With respect to the third count, the Court found that, given the facts

which Mr. Slawik did give to the grand jury, the alleged falsehood was not material as a matter of law.

On January 12, 1977, defendant Slawik filed this motion to withdraw his June 15, 1976 plea to the obstruction of criminal investigation charge. In his supporting affidavit and in his hearing testimony Mr. Slawik conceded that the proceedings leading up to this plea were in full conformity with Rule 11 and that the Court acted properly in accepting his plea on that date. He maintains, however, that a failure to allow him to withdraw his plea at this time would work a manifest injustice because he would not have entered his plea if it had not been for prior perjury convictions which have now been found to be "illegal".

In his hearing testimony Mr. Slawik conceded that he had deliberated at length about entering the plea agreement and had carefully considered with counsel the various courses available to him. He also indicated that his plea had been motivated in part by a desire (1) to reduce his maximum exposure to incarceration on the obstruction charge, (2) to avoid the possibility of a sentence which would run consecutively with the perjury sentences, (3) to obtain the dismissal of the remaining charges and an "end" to the proceedings, and (4) to avoid the trauma of another trial. Further he acknowledged that he had the pending appeal in mind when he considered the plea agreement and consulted with his counsel about the effect of that agreement depending on whether the prior convictions were affirmed or denied. He does not claim any misunderstanding in this regard.

■ What Mr. Slawik does claim is that, despite the other considerations, he would not have pleaded guilty if he had not previously been convicted on the perjury counts. He makes several contentions in support of this claim. First, he says that his first trial, conviction and sentencing, followed by his removal from office, put him in a state of depression which deprived him of his will to fight. Second, he maintains that he believed he had not had a fair trial in the first case and would not receive one in the second. Specifically, in this regard, he claims that extraneous evidence was introduced at his first trial[1] and that he expected similar evidence to be admitted in his second trial. Having been unsuccessful in overcoming what he believed to be the prejudicial effect of this evidence in the first trial, he felt he had no chance of overcoming it in the second. Finally, Mr. Slawik adds that:

> The largest motivation was the idea that I was a convicted perjurer. And I had just been through that trial where I wasn't guilty. I just thought there was no way in God's creation that I could get justice. That was my largest motivation.

With respect to the claim that depression played a role in his decision to enter a plea, it is important to note the precise nature of the claim. The contention, as stated by counsel and confirmed by Mr. Slawik, is as follows:

> . . . [I]t is our contention that Mr. Slawik was not insane in the legal sense at the time that he entered his plea, that he had all of his faculties about him, he had complete ability to understand what was going on, and he had the ability to make decisions. But the ability to make the decisions in this case was acutely affected by the depression he felt as a result of what he believed to be the illegal and wrongful conviction of perjury, an offense of which he felt himself innocent. Do you agree with that?

THE DEFENDANT: Yes.

It may well have been that Mr. Slawik was depressed during the period in which he was deliberating about the plea agreement. It would be surprising if a public figure who had recently been convicted of perjury, removed from office, and sentenced to four years imprisonment did not have some resulting depression. I am satisfied, however, that there is no legally sig-

---

1. This was one of the grounds asserted on appeal of the perjury conviction but was not reached by the Court.

nificant causal relationship between Mr. Slawik's emotional and mental state and his plea. He had a clear understanding of all the relevant considerations, he had the ability to reason and choose, he deliberated at length, and he made a rational decision which clearly appeared at the time to have been in his own best interest. It was apparent from my exposure to Mr. Slawik during the Rule 11 and sentencing proceedings that his actions were informed and voluntary and that his ability to reason was not impaired. In these circumstances I cannot accept any suggestion that Mr. Slawik's will was overborne at the time his plea was entered.[2]

This is not to say that Mr. Slawik's first trial and conviction did not play a role in his decision to plead guilty on June 15th. I do not understand it to be disputed that Mr. Slawik's first trial and conviction convinced him that he would be convicted if he went to trial on the obstruction charges and this belief undoubtedly played a role in his decision to plead to one of those charges. Since both trials involved basically the same factual circumstances, it may be that the preview of the government's evidence afforded by the first trial convinced him that the prosecution could establish his guilt beyond a reasonable doubt. This is the government's view and the strength of its evidence lends support to this contention. I need not determine Mr. Slawik's guilt in this proceeding, however. I accept for present purposes his contention that his belief about the unfavorable prospects for the second trial rested on his view that the introduction of extraneous prejudicial evidence which had deprived him of a fair first trial would likewise deprive him of a fair second one.

While a contrary finding would not change the result which I reach, I am unable to accept Mr. Slawik's contention that the primary factor leading to his plea was the belief that the government's use of the perjury conviction to impeach him at the second trial would destroy his credibility. The government concededly did not indicate any intention to so use the conviction and, in fact, did not intend to use it because of what it considered to be ample ammunition for cross-examination in the tapes and the prior trial testimony. No concern about use of the prior convictions at trial was mentioned by counsel or by Mr. Slawik during the lengthy and thorough presentation of considerations behind the plea agreement. Moreover, given the fact that Mr. Slawik was facing a bench trial, the fact that most of the materials underlying the perjury conviction were available for use by the government, and the fact that any use of the conviction by the government pursuant to Rule 609 of the Federal Rules of Evidence could have been followed by introduction of the fact and grounds of the pending appeal, if Mr. Slawik consulted counsel as he says he did, I do not believe he could have been of the view that the perjury conviction would play a determinative role in the second trial. In short, while the fact of the earlier conviction undoubtedly played a part in his decision, I do not believe that concern about the possibility of the perjury convictions themselves being used at the second trial, played any significant role in Mr. Slawik's deliberations about his plea.

■ Based on these facts I think it clear that nothing in the Constitution requires that Mr. Slawik be permitted to withdraw his plea. Numerous cases have upheld pleas of guilty which were induced by factors far more coercive than the perjury convictions and other pre-trial concerns to which Mr. Slawik now points. A discussion of only a few of these cases will suffice to illustrate the point.

In *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the petitioner was charged with a violation of a kidnapping statute which carried a maximum penalty of death. When the death

---

**2.** I am not certain that Dr. Weintraub's diagnosis of "reactive depression", based on his January 1977 interviews with Mr. Slawik, was intended to suggest that Mr. Slawik was unable to rationally determine what was in his best interest on June 15, 1976. If so, however, I cannot accept this as a fact.

penalty was thereafter found to be unconstitutional, petitioner sought relief in a collateral proceeding alleging that his plea of guilty was not voluntarily entered because the death penalty operated to coerce his plea. The court adopted the test of the Fifth Circuit Court of Appeals for voluntariness, holding:

"[A] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e. g. bribes)."

*Brady, supra,* at 755, 90 S.Ct. at 1472. The court found that merely because the imposition of a death sentence was held to be unconstitutional did not necessarily mean that any pleas entered in order to avoid the statute were not voluntary or intelligent. The court recognized that the voluntariness of a plea can be determined only by a review of all relevant circumstances surrounding it, and that the coercive impact of a death penalty did not render the plea involuntary, holding:

But even if we assume that Brady would not have pleaded guilty except for the death penalty provision of § 1201(a), this assumption merely identifies the penalty provision as a "but for" cause of his plea. That the statute caused the plea in this sense does not necessarily prove that the plea was coerced and invalid as an involuntary act.

*Brady, supra,* at 750, 90 S.Ct. at 1469.

In denying Brady's motion to withdraw his plea, the court found that there was no evidence that "Brady was so gripped by fear of the death penalty or hope of leniency that he did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty." *Brady, supra,* at 750, 90 S.Ct. at 1470. The court also recog-

nized that, although a judgment by a defendant may be based upon then existing law and such judgment subsequently may prove to be improvident, the mere fact of a change of circumstances does not automatically render the prior judgment involuntary and unintelligent, holding:

The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision. A defendant is not entitled to withdraw his plea merely because he discovers long after the plea has been accepted that his calculus misapprehended the quality of the State's case or the likely penalties attached to alternative courses of action. More particularly, absent misrepresentation or other impermissible conduct by state agents . . . ., a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise.

*Brady, supra,* at 757, 90 S.Ct. at 1473.

In *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), Alford entered a plea of guilty to second degree murder, while protesting his innocence, in order to avoid a conviction for first degree murder which would carry a death penalty. When the death penalty was subsequently held to be unconstitutional, Alford sought to withdraw his plea. In upholding the guilty plea as voluntary and intelligent, the Supreme Court held:

That he would not have pleaded except for the opportunity to limit the possible penalty does not necessarily demonstrate that the plea of guilty was not the product of a free and rational choice, especially where the defendant was represented by competent counsel whose advise was that the plea would be to the defendant's advantage.

*North Carolina v. Alford, supra,* at 31, 91 S.Ct. at 164. *See also United States v. Cox,* 464 F.2d 937, 943–44 (6th Cir. 1972); *United*

*States ex rel. Delman v. Butler,* 390 F.Supp. 606 (E.D.N.Y.1975).

Finally, reference should be made to *McMann v. Richardson,* 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970) which is somewhat more analogous to the facts of this case. The petitioners in that case had filed habeas corpus petitions collaterally attacking state convictions entered as a result of guilty pleas. Each maintained that he would not have pleaded guilty but for the fear that a coerced confession would be used against him at his trial. Because of the coerced confession each petitioner had decided to plead guilty in order to avoid the trauma of trial and to minimize the penalties that might have been imposed. In denying relief, the Supreme Court noted that a plea of guilty "before the evidence is in frequently involves the making of difficult judgments." 397 U.S. at 759, 90 S.Ct. at 1448. It also observed that a defendant in the petitioner's position has a choice between taking the advantage which a guilty plea has to offer and proceeding to a trial. If his fears of government overreaching materialize at trial, he is entitled to seek relief from the trial court, an appellate court, or in a collateral proceeding. The court held that if an adequately represented defendant deliberately decides to take the former course, his conviction is the product of his voluntary plea rather than his coerced confession. *See also Lebron-Rosario v. United States,* 493 F.2d 318 (1st Cir. 1974).

Mr. Slawik correctly points out that the standard specified in Rule 32(d) is whether withdrawal of a guilty plea after sentence is necessary to "correct manifest injustice". This standard bestows discretion upon the Court which it does not possess in a collateral attack on a state conviction as being violative of due process. *United States v. Mainer,* 383 F.2d 444, 445–46 (3rd Cir. 1967). At the same time, however, "courts naturally look with a jaundiced eye upon any defendant who seeks to withdraw a guilty plea after sentence . . . ." *United States v. Crusco,* 536 F.2d 21, 24 (3rd Cir. 1976). The Third Circuit has cautioned that a motion to withdraw a plea of guilty

"should be denied if the defendant knew and understood what was being done and there were not present any circumstances of force, mistake, misapprehension, fear, inadvertence, or ignorance of his rights and understanding of the consequences of his plea." *United States v. Ptomey,* 366 F.2d 759, 760 (3rd Cir. 1966).

While this admonition need not be taken as an exhaustive catalog of the circumstances which would warrant post-sentence relief under Rule 32(d), I am confident that such a catalog could not properly include the circumstances of this case.

Simply stated, this is a case where a fully informed and rational defendant elected to plead guilty, in part, to reduce his potential exposure to incarceration and, in part, to avoid a trial in which he was convinced he would be found guilty. Drawing all inferences in Mr. Slawik's favor, his belief regarding the probable result of a trial may have been based upon a concern that extraneous, prejudicial evidence and his prior perjury convictions would be introduced at his second trial. But justice requires only that one in Mr. Slawik's position be guaranteed a fair trial and afforded an adequate remedy in the event he fails to receive one. It does not require that a defendant who voluntarily elects to secure the benefits of a plea bargain be permitted to withdraw his plea seven months after sentencing simply because his confidence in the judicial system has been restored by a successful appeal in a related matter.

Because of Mr. Slawik's guilty plea we cannot know for certain what role, if any, the evidence which caused his concern would have played in his second trial. Given the rules which govern proceedings before a Federal District Court in such matters, I know of no reason to assume that he would not have received a fair trial. But even if I were free to indulge in such an assumption, Mr. Slawik, by virtue of his then pending appeal, knew at the time of his plea that he was not without a remedy.

Mr. Slawik's case is not, as he suggests, a unique one. Undoubtedly there are many

**833**

defendants whose lack of confidence in the system plays a role in their decision to accept the benefits of a plea bargain. We may wish it were not so but no human institution has yet achieved the goal of universal confidence. To recognize this shortcoming, however, does not require that all plea bargain decisions affected by such distrust be held voidable at the option of the defendants who have voluntarily entered them.

The motion will be denied.